IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTINA RICHARDSON, *et al.*,
    *Plaintiffs*,

v.

ALLIANCE RESIDENTIAL
COMPANY,
    *Defendant*.

Civil Action No. ELH-18-1114

## MEMORANDUM OPINION

In this wage and hour case, plaintiffs Christina Richardson and Gordon Clark filed suit against their former employer, Alliance Residential Company ("Alliance" or the "Company"), alleging that Alliance failed to compensate them for overtime work during a portion of their employment, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; the Maryland Wage and Hour Law, Md. Code (2016 Repl. Vol., 2017 Supp.), § 3-401 *et seq.* of the Labor & Employment Article ("L.E.") ("MWHL"); and the Maryland Wage Payment and Collection Law, L.E. § 3-501 *et seq.* ("MWPCL"). ECF 1 (the "Complaint"). In addition to unpaid overtime wages, plaintiffs seek treble damages, interest, attorneys' fees, and costs.

Following discovery, plaintiffs moved for partial summary judgment on their FLSA and MWLH claims. ECF 28.[1] The motion is supported by a memorandum of law (ECF 28-1 at 1-19) (collectively the "Motion"), and numerous exhibits. ECF 28-1 at 20-120; ECF 28-2; ECF 28-3;

---

[1] Maryland's Wage and Hour Law is the State equivalent to the FLSA. *Newell v. Runnels*, 407 Md. 578, 649, 649 n.34, 967 A.2d 729, 771, 771 n.34 (2009). Therefore, a plaintiff's "claim under the MWHL stands or falls on the success of their claim under the FLSA." *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003).

ECF 30-1; ECF 31-1.[2]  Alliance opposes the Motion (ECF 34, the "Opposition") and has submitted seven exhibits.  ECF 36-1 to ECF 36-7.  Plaintiffs have replied.  ECF 39.

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Factual Background

Alliance, a limited liability corporation based in Phoenix, Arizona, owns and manages residential and commercial properties.  *See* ECF 3 (Answer), ¶ 3; *see also Our Company*, ALLIANCE RESIDENTIAL COMPANY, http://www.allresco.com/ (last visited Jan. 23, 2020).  The Company provides management services to an 82-unit apartment building located at 222 East Saratoga Street in Baltimore (the "Property").  ECF 3, ¶ 4.  Each Alliance property is overseen by an on-site "business manager," who is responsible for the day-to-day operations of the property, including marketing and leasing, collecting rent, managing on-site staff, and interfacing with residents.  ECF 28-1 (Elizabeth Karl Deposition) at 23, Tr. 7, 9.  Generally, the business manager reports to a "regional manager," who, in turn, is supervised by a "regional vice president."  *Id.* at 23, Tr. 7.

On April 18, 2016, Alliance hired Ms. Richardson to serve as the Property's business manager.  ECF 28-1 (Richardson Answers to Interrogatories) at 60, No. 2.  When Ms. Richardson began working at Alliance, she was directly supervised by regional vice president Elizabeth Karl, because the Company had no regional manager.  ECF 28-1 at 23, Tr. 8.  Ms. Richardson reported to Ms. Karl from April 2016 to December 2016.  *Id.*  Alliance hired Sarah Malone as a regional manager in December 2016.  *Id.*  Thereafter, Ms. Richardson reported to Ms. Malone until Ms. Richardson left Alliance in November 2017.  *Id.*; *see also* ECF 28-1 at 60, No. 2.

---

[2] By the Court's count, plaintiffs' exhibits total more than 700 pages.

Mr. Clark worked as the Property's on-site service supervisor from approximately October 2016 to October 2017. ECF 28-1 (Clark Answers to Interrogatories) at 71, No. 2; *see also* ECF 28-3 (Clark Deposition) at 110, Tr. 12; *id.* at 115, Tr. 32. Ms. Richardson supervised Mr. Clark for the entirety of his employment. ECF 28-1 (Alliance Admissions) at 82, No. 6; *see also* ECF 28-1 at 25, Tr. 16.

Both Ms. Richardson and Mr. Clark were employed as hourly workers, subject to the FLSA's overtime wage requirements. ECF 28-1 at 81, No. 2. Between February 2017 and November 2017, Ms. Richardson's regular rate of pay was $28.59 per hour. *Id.* at 83, No. 10. Mr. Clark was paid $24.00 per hour between October 2016 and June 16, 2017, and $24.96 per hour from June 16, 2017 to October 2017. *Id.* at 83, No. 10-11. In addition, Mr. Clark received a $168.50 monthly housing subsidy to reside at the Property. *See* ECF 28-1 (Clark Earnings Statements) at 87-119.

Ms. Richardson was regularly scheduled to work Monday through Saturday. ECF 28-2 at 15, Tr. 54-55. She was scheduled to work 40 regular hours between 9:00 a.m. and 5:00 p.m. during the week and from 10:00 a.m. to 5:00 p.m. on Saturday. *Id.* Mr. Clark's regular hours were Monday through Friday from 8:00 a.m. to 4:00 p.m. ECF 29-1 (Clark Deposition) at 4, Tr. 67.[3] Alliance anticipated that Ms. Richardson and Mr. Clark would occasionally need to work additional hours beyond their regular schedule. ECF 28-2 (Malone Deposition) at 120; ECF 28-3 at 1, 4-6.

When Ms. Richardson and Mr. Clark were hired, Alliance provided them with a copy of its Associate Handbook (the "Handbook"). ECF 28-2 at 6, Tr. 20-21; ECF 29-1 at 3-4, Tr. 65-66.

---

[3] Although not entirely clear, it appears that Ms. Richardson received an unpaid lunch break. ECF 28-2 at 8, Tr. 29. Mr. Clark testified during his deposition that he believed that his work schedule did not include a break for lunch. ECF 29-1 at 4, Tr. 67-68.

Plaintiffs agreed to read the Handbook and become familiar with its provisions. *Id.* The Handbook advised employees that federal and state law required accurate timekeeping, and that Alliance had implemented timekeeping procedures for employees to record and submit accurate time records. *See* ECF 36-1 (Alliance Handbook) at 27. The Handbook stated, in part, *id.*:

> **Accurate Time.** Accurately recording time worked is the responsibility of every Associate. Federal and state laws require the Company to keep an accurate record of time worked in order to calculate Associate pay and benefits. Time worked is all the time actually spent on the job performing assigned duties. Associates are expected to regularly arrive at work on time, ready to work. Associates will be disciplined for excessive and/or unexcused absences. Non-exempt Associates should accurately record the time they begin and end their work, as well as the beginning and ending time of each meal period. They also should record the beginning and ending time of any split shift or departure from work for personal reasons.

Further, the Handbook contained an "electronic devices" policy. *Id.* at 32-33. In part, it advised, *id.*:

> **Non-Exempt After Hours Work Policy:** For those Associates who are given an iPhone/Blackberry for business purposes, there is to be a balance between your work and family life. Alliance does not expect you to answer emails and business related calls at all hours of the day or to use the devices outside of regular business hours other than for occasional business purposes. This device is given to you primarily for business purposes during regular working hours and should be treated as such.
>
> For those Associates who personally choose to set up their work email to go to their personal cell phones, please realize that this is your own choice and that you are responsible for all payments in connection with such devices.
>
> For those non-exempt Associates who use a company laptop and/or personal/Company cell phone for business purposes, you are required to record on an overtime log sheet all time you spend outside your regular work schedule on business related e-mails and calls. That time must be timely submitted with payroll.
>
> If you are a non-exempt Associate and find that you are required to do more than occasional work outside your scheduled hours, you must advise your manager and the People Office. You must obtain their approval for continued use of your device for business purposes after hours.

And, the Handbook contained a section titled "**OVERTIME PAY FOR NON-EXEMPT ASSOCIATES**." *Id.* at 57 (emphasis in original). The section provided, *id.*:

a. **Prior Approval.** Non-exempt Associates may be required to work overtime at their Supervisor's request. All overtime requires the prior approval of the Associate's Supervisor or Manager. Associates who work overtime without prior approval will be paid in accordance with the law, however, may be subject to disciplinary action up to and included termination for violating the prior approval requirement.

b. **Record All Hours Worked**. If your position is classified as non-exempt, you must record all hours worked. Working off the clock is prohibited, and no manager has the authority to require any Associate to do so. Any Associate who works off the clock or any manager that requests an Associate work off the clock may be subject to disciplinary action up to and including termination.

c. **Miscellaneous**. To respect each Associate's personal schedule, every effort will be made to minimize unwanted overtime. However, business demands are such that overtime may be required as a condition of employment. The company pays overtime in accordance with applicable federal and state laws. "Hours worked" does not include paid time off for holidays, vacation, illness, inclement weather, jury duty or bereavement.

To assist Ms. Richardson and Mr. Clark track their hours, Alliance provided them with laptops that were installed with a timekeeping application. *See* ECF 28-2 at 6, Tr. 18-19; *id.* at 8, Tr. 26-27; ECF 29-1 at 6, Tr. 75. If Ms. Richardson or Mr. Clark forgot to record their hours on the computerized timekeeping application, they could utilize a "Time Clock Correction Form" to capture time spent working. *See* ECF 36-3 (Richardson Time Correction Forms); ECF 36-5 (Clark Time Correction Forms); *see also* ECF 28-2 at 8, Tr. 28-29; *id.* at 32, Tr. 125; ECF 28-3 (Malone Deposition) at 22, 35; ECF 29-1 at 12, Tr. 99-100. Throughout their time at Alliance, Mr. Richardson and Ms. Clark regularly tracked their hours using the timekeeping software and Time Clock Correction Forms. *See* ECF 36-2 (Richardson Timekeeping Records); ECF 36-4 (Clark Timekeeping Records); *see also* ECF 36-3; ECF 36-5.

As noted, Ms. Richardson reported directly to Ms. Karl between April 2016 and December 2016. Ms. Richardson and Ms. Karl never spoke about overtime or performing off-the-clock work. ECF 28-2 at 6, Tr. 19. Nor did Ms. Karl require Ms. Richardson to seek advanced approval before working overtime. *Id.* at 12, Tr. 44. Ms. Richardson testified during her deposition that while working for Ms. Karl, she accurately recorded her hours and was paid for all hours recorded. *See id.* at 16, Tr. 58. Ms. Richardson's biweekly earning statements reflect that she averaged 39.92 hours of regular work and 7.2 hours of overtime work per week between April 2016 and December 2016. *See* ECF 36-6 (Richardson Earnings Statements).[4]

As indicated, at the relevant time, either Ms. Karl or Mr. Malone supervised Ms. Richardson and Ms. Richardson supervised Mr. Clark. During the period of time that Ms. Karl supervised Ms. Richardson, Mr. Clark would record time for work occurring outside of his regular hours that he considered a "major" task, such as repair that took an hour or more to complete. ECF 29-1 at 12, Tr. 98; *see id.* at 19, Tr. 128-29. In contrast, Mr. Clark did not record "minor" tasks that took 15-20 minutes or less, such as assisting a resident who was locked out of an apartment

---

[4] Ms. Richardson's earning statements reflect that she worked 80 regular hours and 7.63 overtime hours for the period ending on April 29, 2016; 80 regular hours and 16.28 overtime hours for the May 13, 2016 pay period; 84.98 regular hours and 4.23 overtime hours for the May 27, 2016 pay period; 83.02 regular hours and 13.3 overtime hours for the June 10, 2016 pay period; 76.95 regular hours and 2.33 overtime hours for the June 24, 2016 pay period; 80 regular hours and 5.93 overtime hours for the July 8, 2016 pay period; 80 regular hours and 27.27 overtime hours for the July 22, 2016 pay period; 79.8 regular hours and 3.47 overtime hours for the August 5, 2016 pay period; 80 regular hours and 26.9 overtime hours for the August 19, 2016 pay period; 80 regular hours and 21.62 overtime hours for the September 2, 2016 pay period; 80 regular hours and 26.33 overtime hours for the September 16, 2016 pay period; 79.27 regular hours and 17.15 overtime hours for the September 30, 2016 pay period; 80 regular hours and 26 overtime hours for the October 14, 2016 pay period; 80 regular hours and 13.37 overtime hours for the October 28, 2016 pay period; 80 regular hours and 7.25 overtime hours for the November 11, 2016 pay period; 75.27 regular hours and 15.75 overtime hours for the November 25, 2016 pay period; 80 regular hours and 17.3 overtime hours for the December 9, 2016 pay period; 78 regular hours and 7.08 overtime hours for the December 23, 2016 pay period. *See* ECF 36-6 at 1-23.

or fixing the garage gate. *Id.* at 12, Tr. 98-100. Mr. Clark's computerized timekeeping records appear consistent with this practice. For example, on October 11, 2016, Mr. Clark recorded having worked from 8:00 a.m. to 5:00 p.m. and again from 7:00 p.m. to 9:00 p.m. ECF 36-4 at 2. Like Ms. Richardson, Mr. Clark acknowledged during his deposition that he was paid for the time that he recorded between October and December 2016. ECF 29-1 at 12, Tr. 98.

However, plaintiffs allege that after Ms. Malone replaced Ms. Karl in December 2016, she expressly instructed them not to record more than 40 hours of work per week. According to Ms. Richardson, she and Ms. Malone met in the Property's community room sometime in February 2017 to discuss Ms. Richardson's overtime. *See* ECF 28-2 at 16, Tr. 16; *see id.* at 18, Tr. 18. Ms. Richardson testified during her deposition that Ms. Malone said: "[Alliance] didn't have any money right now to pay overtime, my hours that I could get paid for were 9:00 to 5:00, but my job description expectations did not change." *Id.* at 25, Tr. 97; *see also id.* at 26, Tr. 100 ("[S]he stated that I could only basically get paid from 9:00 to 5:00, but my expectations and me being on call, none of that was changing."). Ms. Richardson knew that Ms. Malone's directive violated Alliance's policies. *Id.* at 29, Tr. 112. But, she did not report the conversation to Ms. Karl or to the Company's human resources department because she was worried that doing so could lead to her termination. *Id.* at 29, Tr. 112-13; *see also id.* at 30, Tr. 115.

Ms. Malone acknowledges that she met with Ms. Richardson to discuss Ms. Richardson's overtime work. ECF 28-3 at 13; ECF 35 (Malone Affidavit), ¶ 5. However, Ms. Malone avers that she "absolutely did not say anything to her that she could reasonably have construed as an order, instruction or suggestion that she should fail to record the actual hours that she worked or that she should otherwise violate Alliance's published time-keeping policy that required Ms. Richardson to accurately record all hours worked." ECF 35, ¶ 5; *see id.* ¶ 6. Rather, according to

Ms. Malone, she informed Ms. Richardson that her overtime hours were greater than expected and encouraged her to use her regular hours more efficiently to complete work tasks. *See id.* ¶ 5; ECF 28-3 at 13-14. Further, Ms. Malone maintains that she never mentioned the profitability of the Company or the Property. ECF 35, ¶ 7; *see also* ECF 28-3 at 15. Ms. Richardson's overtime pay would not affect Alliance's finances, Ms. Malone testified, because the Company's contract with the Property's owner allowed Alliance to pass the cost of the wages paid to Ms. Richardson and Mr. Clark through to the owner. ECF 35, ¶ 7.

Shortly after Ms. Richardson met with Ms. Malone, Ms. Richardson spoke with Mr. Clark. ECF 28-2 at 13, Tr. 49; *see* ECF 29-1 at 14-15, Tr. 106-113. Ms. Richardson mentioned that she had just talked to Ms. Malone. ECF 29-1 at 14, Tr. 109. She then told Mr. Clark that he could not record more than 40 hours of work per week on his timecard. *Id.* at 15, Tr. 110, 113. Upset by this, Mr. Clark ended the conversation and walked away from Ms. Richardson. *Id.* at 16, Tr. 114. Mr. Clark never spoke directly with Ms. Malone about his overtime work. *Id.* at 13, Tr. 105.

Ms. Richardson contends that despite Ms. Malone instructing her to record no more than 40 hours of work per week, Ms. Malone increased her job responsibilities. ECF 28-2 at 23-24, Tr. 86-91. As a result, Ms. Richardson avers that, between February 2017 and November 2017, she typically worked 96.5 hours per week. ECF 28-1 at 60, No. 2; *see* ECF 28-2 at 63, Tr. 246. Specifically, Ms. Richardson claims that she worked from 8:15 a.m. to 8:00 p.m. Monday through Friday and from 9:15 a.m. to 5:00 p.m. on Saturday. ECF 28-1 at 60, No. 2; ECF 28-2 at 63, Tr. 246; *id.* at 64, Tr. 251. In addition, she claims to have spent approximately 29 hours per week organizing resident events, completing work assignments, responding to emergencies, and answering calls from residents. ECF 28-1 at 60, No. 2; ECF 28-2 at 64-65, Tr. 251-53, 255. For example, Ms. Richardson testified at her deposition that she dealt with roughly six or seven after-

hours emergency calls from Property residents each week. ECF 28-2 at 11, Tr. 38. Thus, Ms. Richardson maintains that, during the period she was supervised by Ms. Malone, she worked an average of 40 regular hours and 56.5 hours of overtime each week. ECF 28-1 at 60, No. 2.

Ms. Richardson's time records and earnings statements for the period of January 6, 2017 through October 27, 2017, reflect an average of 38.16 hours of regular work and 4 hours of overtime work per week. *See* ECF 36-6 at 24-50.[5] But, Ms. Richardson's timekeeping records show that she regularly clocked in and out of work outside of her 9:00 a.m. to 5:00 p.m. schedule. *See, e.g.*, ECF 36-2 at 2 (3/30/2017; clocking-out at 7:14 p.m.); *id.* at 5 (6/02/2017; clocking out at 6:11 p.m.); *id.* (6/20/2017; clocking out at 8:08 p.m.); *id.* at 6 (7/17/2017; clocking out at 7:07 p.m.); *id.* (7/25/2017; clocking out at 7:10 p.m.); *id.* at 8 (10/4/2017; clocking out at 6:52 p.m.); *id.* (10/11/2017; clocking out at 9:23 p.m.). And, Ms. Richardson recorded having worked on Sundays, hours for which she would be paid at her overtime rate. *See* ECF 36-2; *id.* at 2

---

[5] Ms. Richardson's earning statements reflect that she worked 73.03 regular hours and 32 overtime hours for the period ending on January 6, 2017; 80 regular hours and 10.93 overtime hours for the January 20, 2017 pay period; 80 regular hours and 1.74 overtime hours for the February 3, 2017 pay period; 57.12 regular hours and 0 overtime hours for the February 17, 2017 pay period; 92.41 regular hours and 9.4 overtime hours for the March 3, 2017 pay period; 71.98 regular hours and 1.62 overtime hours for the March 17, 2017 pay period; 80 regular hours and 6.35 overtime hours for the March 31, 2017 pay period; 80 regular hours and 2.8 overtime hours for the April 14, 2017 pay period; 73.03 regular hours and 2.42 overtime hours for the April 28, 2017 pay period; 80 regular hours and 9.9 overtime hours for the May 12, 2017 pay period; 37.5 regular hours and 0 overtime hours for the May 26, 2017 pay period; 77.78 regular hours and 7.15 overtime hours for the June 9, 2017 pay period; 80 regular hours and 8.5 overtime hours for the June 23, 2017 pay period; 74.4 regular hours and 1.07 overtime hours for the July 7, 2017 pay period; 80 regular hours and 12.93 overtime hours for the July 21, 2017 pay period; 80 regular hours and 14.48 overtime hours for the August 4, 2017 pay period; 80 regular hours and 18.53 overtime hours for the August 18, 2017 pay period; 79.83 regular hours and 7.82 overtime hours for the September 1, 2017 pay period; 80 regular hours and 9.12 overtime hours for the September 15, 2017 pay period; 80 regular hours and 2.88 overtime hours for the September 29, 2017 pay period; 80 regular hours and 10.15 overtime hours for the October 13, 2017 pay period; and 80 regular hours and 3.03 overtime hours for the October 27, 2017 pay period. *See* ECF 36-6 at 24-50.

(2/12/2017); *id.* at 4 (5/7/2017); *id.* at 6 (7/2/2017 and 8/13/2017); *id.* at 7 (9/10/2017); *id.* at 8 (10/8/2017). Ms. Richardson also continued to use Time Correction Forms to record hours. *See generally* ECF 36-3.

Mr. Clark maintains that, following his conversation with Ms. Richardson, he worked 50 hours per week: 40 regular hours between Monday and Friday and an additional 10 hours of overtime work on the evenings or weekends. ECF 28-1 at 71, No. 2. However, Mr. Clark also admitted during his deposition that he did not change how he recorded his hours after talking to Ms. Richardson. That is, he continued to record hours outside of his regular schedule for "major" tasks, but not for minor tasks. ECF 29-1 at 19, Tr. 129; *see also id.* at 12, Tr. 98-101.

Mr. Clark's timekeeping records and Time Correction Forms support his testimony. *See* ECF 36-4 at 5 (2/19/2017; clocking-in for 2 hours of Sunday work); *id.* at 6 (4/8/2017; clocking-in for 2 hours of Saturday work); *id.* at 7 (6/12/2017; clocking-in from 8:00 a.m. to 4:07 p.m. and from 6:45 p.m. to 7:48 p.m.); *id.* at 8 (6/21/2017; clocking-in from 8:00 a.m. to 11:00 p.m.); *see also* ECF 36-5 at 4 (2/19/17; clocking-in from 8:00 p.m. to 11:00 p.m. for an emergency call); *id.* at 12 (11/4/2017; clocking-in for 2 hours of Saturday work for a service call). On average, Mr. Clark worked 37 regular hours and 4.2 overtime hours per week between January 6, 2017 and October 27, 2017. *See* ECF 28-1 at 87-120.[6]

---

[6] Mr. Clark's earning statements reflect that he worked 67.22 regular hours and 32 overtime hours for the period ending on January 6, 2017; 48.07 regular hours and 5.2 overtime hours for the January 20, 2017 pay period; 80 regular hours and 9.32 overtime hours for the February 3, 2017 pay period; 65.03 regular hours and no overtime hours for the February 17, 2017 pay period; 89.24 regular hours and 2.23 overtime hours for the March 3, 2017 pay period; 73.83 regular hours and 1.93 overtime hours for the March 17, 2017 pay period; 80 regular hours and 1.8 overtime hours for the March 31, 2017 pay period; 80 regular hours and 2.17 overtime hours for the April 14, 2017 pay period; 72.6 regular hours and 5.78 overtime hours for the April 28, 2017 pay period; 80 regular hours and 5.23 overtime hours for the May 12, 2017 pay period; 80 regular hours and 9.27 overtime hours for the May 26, 2017 pay period; 73.2 regular hours and 3.15 overtime hours for the June 9, 2017 pay period; 80 regular hours and 12.23 overtime hours for the June 23, 2017 pay

Ms. Malone maintains that she regularly reviewed Ms. Richardson's biweekly time records and believed that they accurately reflected her hours of work. ECF 28-3 at 20-21; ECF 35, ¶ 9. She claims that she had no reason to doubt the veracity of Ms. Richardson's recorded hours because Ms. Richardson's timesheets and Time Correction Forms showed a variety of starting and stopping times and included occasional weekend and after-hours work. ECF 35, ¶ 9. However, Ms. Malone acknowledges that she did not independently verify the accuracy of Ms. Richardson's time entries and Time Correction Forms. ECF 28-3 at 23. And, Ms. Malone did not personally observe Ms. Richardson's hours because she did not regularly visit the Property. ECF 35, ¶ 10.

Ms. Malone admits that she knew that Ms. Richardson performed work outside of regular business hours "on occasion." *Id*. But, Ms. Malone asserts that she did not pay attention to the timestamp on email communications that Ms. Richardson sent to her because she was focused on the content of the messages and their attachments. *Id*. Ms. Malone also maintains that she "very seldom knew about any direct communications that [Ms. Richardson] might have had with residents by text or phone after regular business hours." *Id.* In fact, Ms. Malone repeatedly instructed Ms. Richardson that she did not need to respond to after-hours inquiries that did not involve maintenance emergencies. *See* ECF 28-2 at 49, Tr. 190; ECF 28-3 at 46-47; ECF 35, ¶ 8.

However, Ms. Richardson maintains that Ms. Malone was aware that she regularly worked beyond her normal schedule. Ms. Richardson frequently communicated through text and

---

period; 74.68 regular hours and 0.6 overtime hours for the July 7, 2017 pay period; 80 regular hours and 8.53 overtime hours for the July 21, 2017 pay period; 80 regular hours and 17.48 overtime hours for the August 4, 2017 pay period; 52.17 regular hours and 27.83 overtime hours for the August 18, 2017 pay period; 80 regular hours and 10.48 overtime hours for the September 1, 2017 pay period; 74.68 regular hours and 6.07 overtime hours for the September 15, 2017 pay period; 64.02 regular hours and 3.82 overtime hours for the September 29, 2017 pay period; 80 regular hours and 8.98 overtime hours for the October 13, 2017 pay period; and 80 regular hours and 11.43 overtime hours for the October 27, 2017 pay period. *See* ECF 28-1 at 87-120.

email with Ms. Karl and Ms. Malone. *See generally* ECF 30-1 (emails and texts); ECF 31-1 at 15-17 (log of after-hours texts and emails). For example, on May 22, 2017, Ms. Malone emailed Ms. Richardson at 9:53 p.m. asking her about a report, to which Ms. Richardson responded at 10:02 p.m. that she would investigate the issue in the morning. ECF 30-1 at 16. And, on September 14, 2016, Ms. Malone emailed Ms. Richardson at 6:52 p.m. asking her to send her leasing materials; Ms. Richardson responded at 6:53 p.m. that she was working on the materials and would send them soon. *Id.* at 46. Ms. Richardson also discussed with Ms. Malone the after-hours community events that she organized at the Property. *Id.* at 19 (email planning resident events).

As with Ms. Richardson, Ms. Malone avers that she was not aware that Mr. Clark was not accurately recording his work hours. ECF 35, ¶ 11. And, she maintains that Mr. Clark knew how to contact her, but that he never reached out to discuss his overtime hours. *Id.*

Mr. Clark resigned from Alliance in October 2017, and Ms. Richardson left the following month. ECF 28-1 at 60, No. 2; ECF 28-3 at 110, Tr. 12. According to Ms. Richardson, despite working 96.5 hours per week between February 1, 2017 and October 13, 2017, she was only paid for 45 hours of work per week, including 5 hours of overtime pay. *See* ECF 28-1 at 3. Therefore, she seeks compensation for 51.5 hours of overtime pay for 36 weeks. *See* ECF 28-1 at 65, No. 10; ECF 28-2 at 48, Tr. 189 (Ms. Richardson admitting that she was paid accurately for the last three weeks of her work at Alliance). Because her overtime rate was $42.89 per hour (1.5 times her regular rate of $28.59), Ms. Richardson avers that the Company owes her $79,518.06 in unpaid wages. *See* ECF 28-1 at 60, No. 2 (seeking $2,208.84 in wages per week). Mr. Clark seeks $14,944.20 for the ten hours of overtime that he alleges he worked each week without compensation from February 1, 2017 to November 2017. ECF 28-1 at 76, No. 10.

## II.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III. Discussion

### A. The FLSA

The FLSA is "'best understood as the minimum wage/maximum hour law.'" *U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 280 (4th Cir. 2019) (citation omitted). Enacted in 1938, Congress intended the FLSA "to protect all covered workers from substandard wages and oppressive working hours[.]" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981); *see Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 136 S. Ct. 2117, 2121 (2016); *Fire & Safety Investigation*, 915 F.3d at 280; *Morrison v. Cty. of Fairfax*, 826 F.3d 758, 761 (4th Cir. 2016). To that end, the FLSA provides that "no employer shall employ" a covered employee in excess of 40 hours in a given week unless the employee is paid at "a rate not less than one and one-half times the regular rate at which he is employed" for each additional hour worked. 29 U.S.C. § 207(a)(1); *see Encino Motorcars*, 136 S. Ct. at 2121; *Fire & Safety Investigation*, 915 F.3d at 280; *Harhourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016). With certain exceptions not relevant here, an employee's "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e); *see Fire & Safety Investigation*, 915 F.3d at 280; *Flood v. New Hanover Cty.*, 125 F.3d 249, 251 (4th Cir. 1997).

Several categories of workers are exempt from the FLSA's overtime provision. *See* 29 U.S.C. § 213. But, because "coverage under the FLSA is construed 'liberally,'" *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004) (citation omitted), the FLSA's exemptions "are to be narrowly construed." *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 295 (1959). And, the employer bears the burden of proving that an employee falls within an exemption to the FLSA. *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 121 (4th Cir. 2015). Here, there is no

dispute that Ms. Richardson and Mr. Clark are covered employees under the FLSA. ECF 28-1 at 81, No. 2.

Under the FLSA, to "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). That broad definition effectuates the FLSA's remedial purpose by preventing an employer from circumventing the FLSA by feigning ignorance to its employees' overtime work. Work includes labor that the employer did not request but "knows or has reason to believe" that the employee is performing. 29 C.F.R. § 785.11. And, it includes work performed on the job site as well as at home. *See id.* § 785.12. Further, the FLSA places the onus on the employer to "exercise its control and see that the work is not performed if it does not want it to be performed." *Id.* § 785.13. An employer "cannot sit back and accept the benefits without compensating for them." *Id.*

An employer has a non-delegable duty to keep accurate records of the hours that its employees work. *See* 29 U.S.C. § 211(c); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-88 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act, Pub. L. No. 49–52, § 5, 61 Stat. 84, 87 (1947) (codified at 29 U.S.C. § 216(b)); *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 309 (D. Md. 2014) ("The FLSA makes clear that employers, not employees, bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by the employees."). However, the employee "has the burden of establishing the hours he claims to have worked and the work he claims to have performed for which he was not paid." *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (D. Md. 2005), *aff'd*, 247 F. App'x 430 (4th Cir. 2007) (per curiam); *accord Randolph v. PowerComm Const., Inc.*, 7 F. Supp. 3d 561, 573 (D. Md. 2014).

In *Mt. Clemens Pottery Co.*, 328 U.S. 680, the Supreme Court addressed the burden of proof to recover for uncompensated work. *See id.* at 686-87. The Court stated: "When the

employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Id.* at 687. However, "where the employer's records are inaccurate or inadequate," the Court opined that "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id.* The Court explained, *id.* at 687-88:

> In such a situation . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

This framework "does not mandate that a plaintiff prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988). Rather, an employee can sustain his burden by a "declaration asserting the average number of hours he worked." *Sanabria v. Cocody, Inc.*, DKC 16-0365, 2017 WL 3022990, at *4 (D. Md. July 17, 2017). That said, a plaintiff cannot meet his burden through "speculation" alone. *McLaughlin*, 436 F. Supp. 2d at 738.

Although the FLSA's record keeping obligations fall squarely on the employer, the law "'stops short of requiring the employer to pay for work it did not know about, and had no reason to know about.'" *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017) (quoting *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011)). The Fourth Circuit has observed that "to be liable for overtime wages under the FLSA, an employer must have 'knowledge, either actual or constructive of that overtime work.'" *Bailey v. Cty. of Georgetown*, 94 F.3d 152, 157 (4th Cir.1996) (alteration omitted) (quoting *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)); *accord Craig v. Bridges Bros. Trucking* LLC, 823 F.3d 382, 391 (6th Cir. 2016) (citing *Davis*);

*Manning v. Bos. Med. Ctr. Grp.*, 725 F.3d 34, 44 (1st Cir. 2013) (same); *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (same); *Chao v. Gotham Registry, Inc.*, 514 F.3d 280 (2d Cir. 2008) (same). "An employer has constructive knowledge of an employee's work if it should have acquired knowledge of that work through reasonable diligence." *Allen*, 865 F.3d at 938; *Craig*, 823 F.3d at 388; *Hertz v. Woodbury Cty.*, 566 F.3d 775, 781 (8th Cir. 2009); *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1321 (11th Cir. 2007). Whether an employer has exercised "reasonable diligence" sufficient to relieve it of FLSA liability "depend[s] on the facts of each case." *Allen*, 865 F.3d at 943.

Notably, the plaintiff bears the burden of proving that the defendant had actual or constructive knowledge of the plaintiff's overtime work. *Pforr*, 851 F.2d at 109; *Davis*, 792 F.2d at 1276; *see also Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 775 (D.S.C. 2017) (collecting cases in the Fourth Circuit). In other words, the knowledge requirement is an element of the plaintiff's claim, not an affirmative defense asserted by the defendant. *Pforr*, 851 F.2d at 109.

Further, as Judge Chasanow has observed, "*occasional* after-hours work is not sufficient to raise a genuine dispute of material fact that the employer was on notice of the employee's *consistent* overtime work for a *long period of time*." *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 803 (D. Md. 2014) (emphasis in original). For example, a single conversation between an employee and his boss in conjunction with infrequent after-hours work was insufficient in one case to create a genuine dispute of material fact as to the employer's knowledge of the employee's overtime work. *Caseres v. S & R Mgmt. Co., LLC*, AW-12-01358, 2013 WL 4010894, at *5 (D. Md. Aug. 5, 2013); *accord Castillo v. Joann Urquhart, M.D., P.C.*, PX-17-1810, 2019 WL 4750294, at *5 (D. Md. Sept. 30, 2019) (no evidence employer knew employee worked overtime where email correspondence and calendars did not corroborate that plaintiff performed after-hours

work).  In contrast, evidence in the record that the employer sent assignments to the employee that had to be read before his shift began was sufficient to create a genuine dispute of material fact as to the employer's knowledge of off-the-clock work.  *See Butler*, 55 F. Supp. 3d at 805.

## B.  Analysis

Plaintiffs contend that summary judgment is warranted on their FLSA and MWLH claims under the *Mt. Clemens* framework.  *See* ECF 28-1 at 5-17.  According to plaintiffs, "there is no question" that Alliance failed to keep accurate time records and that Alliance knew Ms. Richardson and Mr. Clark were working overtime without compensation.  *Id.* at 6.  And, they argue that their interrogatory responses, deposition testimony, and text and email records establish that, during Ms. Malone's tenure as regional manager, Ms. Richardson worked 51.5 hours of uncompensated overtime per week and Mr. Clark worked 10 hours of uncompensated overtime per week.  *Id.* at 12-15.  Further, they assert that Alliance cannot negate their evidence of overtime work.  Thus, plaintiffs maintain that Ms. Richardson is entitled to $79,518.06 and Mr. Clark is entitled to $14,944.20 in unpaid wages, plus "equal" amounts in liquidated damages.  *Id.* at 18.

Alliance counters that neither Ms. Richardson nor Mr. Clark is entitled to summary judgment.  The Company posits that plaintiffs have not demonstrated that it knew Ms. Richardson was working without pay.  ECF 34 at 24.  With respect to Mr. Clark, the Company avers that summary judgment would be improper because it is unclear whether Ms. Richardson had actual or apparent authority to instruct Mr. Clark to work off-the-clock.  *Id.* at 35.  Further, defendant asserts that where an employer establishes a reasonable process for employees to record their hours an employee's failure to accurately track overtime cannot give rise to a FLSA claim.  *Id.* at 27, 29.

1.  Ms. Richardson

Plaintiffs argue that Ms. Richardson has established a prima facie case under *Mt. Clemens* because there is no genuine issue of material fact that Ms. Karl and Ms. Malone either knew or should have known of Ms. Richardson's unreported overtime work.  ECF 28-1 at 8-12.  In sharp contrast, Alliance suggests that Ms. Richardson is estopped from seeking lost wages under the FLSA because she failed to follow the Company's established procedures for recording her hours. ECF 34 at 27-29.  And, the Company contends that there is a genuine dispute as to whether it had actual or constructive knowledge that Ms. Richardson was working off-the-clock.  ECF 34 at 24-31.

Relying on the case of *White v. Baptist Memorial Health Care Corporation*, 699 F.3d 869 (6th Cir. 2012), defendant argues that Ms. Richardson's failure to log her hours accurately precludes her from seeking damages under the FLSA.  *See* ECF 34 at 27; *see also id.* at 29-30 (citing other cases).

In *White*, 699 F.3d 869, the plaintiff, a nurse, filed an FLSA action against her employer, alleging that she was not compensated for missed meal breaks.  *Id.* at 872.  The district court granted summary judgment for the defendant, and the plaintiff appealed to the Sixth Circuit.  *Id.* Upon review, the Sixth Circuit noted that a claim seeking compensation for missed meal breaks was "'analytically similar'" to a claim for unpaid overtime.  *Id.* at 873 (quoting *Hertz*, 566 F.3d at 783).  After canvassing decisions from the Eighth, Fifth, and Ninth Circuits, the court stated: "Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process."  *Id.* at 876 (citing *Hertz*, 566 F.3d at 781-82; *Newton v. City of Henderson*, 47 F.3d 746, 49-50 (5th Cir. 1995); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646

F.2d 413, 414-15 (9th Cir. 1981)). The employer should be absolved from liability, the court reasoned, because "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *Id.*

Turning to the plaintiff's claim, the court found that the defendant had instructed employees to record their missed meals. *See id.* at 872-73. And, it observed that "[e]ach time" the plaintiff "followed [the defendant's] procedures for being compensated for interrupted meal breaks or for payroll errors she was compensated." *Id.* Although the plaintiff "occasionally told her supervisors that she was not getting her meal breaks," the court noted that "she never told her supervisors that she was not being compensated for missing her meal breaks." *Id.* Thus, the court ruled that the plaintiff was barred from recovering under the FLSA because she was fully aware of her employer's policy, but nonetheless failed to report uncompensated work time. *Id.*

*White* did not set forth a categorical rule that an employer's knowledge is irrelevant so long as the employer has implemented a time keeping system. Rather, the *White* Court observed that summary judgment was appropriate in light of the finding that "there [w]as no evidence that [the defendant] discouraged employees from reporting time worked during meal breaks or that they were otherwise notified that their employees were failing to report time worked during meal breaks." *Id.* at 877. And, that is precisely the situation alleged here; Ms. Richardson testified at her deposition that Ms. Malone told her that "[Alliance] didn't have any money right now to pay overtime, my hours that I could get paid for were 9:00 to 5:00, but my job description expectations did not change." ECF 28-2 at 25, Tr. 97; *see also id.* at 95; *id.* at 26, Tr. 100; *id.* at 28, Tr. 107.

Indeed, the Sixth Circuit has cautioned against overreading *White*, acknowledging that notwithstanding *White*'s estoppel rule, "employers who "prevent[] the employees from reporting

overtime or [are] otherwise notified of the employees' unreported work' are still on the hook for unpaid overtime." *Craig*, 823 F.3d at 389 (alterations in *Craig*) (quoting *White*, 699 F.3d at 876). Accordingly, the Sixth Circuit has declined to apply *White* where the parties disputed the employer's knowledge of the employee's overtime work. *Craig*, 823 F.3d at 390-91.

Notably, courts in this District and elsewhere have rejected plaintiff's broad reading of *White*, reasoning that its estoppel rule is contrary to the FLSA. *See, e.g.*, *Butler DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 804-05 (D. Md. 2014); *Smith v. ABC Training Ctr. of Md., Inc*., JFM-13-306, 2013 WL 3984630, at *9 (D. Md. Aug. 1, 2013); *see also Allen*, 865 F.3d at 943 (stressing that "[t]he requirements of reasonable diligence depend on the facts of each case"). Indeed, *White* appears improperly to shift the obligation to keep accurate work records from the employer to the employee. *See* 29 U.S.C. § 211(c) ("Every employer [covered under the FLSA] shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment"). And, its rule rewards an employer for turning a blind eye to its employees' hours, flouting the remedial purposes of the FLSA. *See Calderon*, 809 F.3d at 121 ("The FLSA's overtime requirement 'was intended to spread employment by placing financial pressure on the employer and to compensate employees for the burden of a workweek in excess of the hours fixed in the Act.'") (citation omitted). Thus, the touchstone of the inquiry is what the employer knew or should have known, not whether the employee meticulously tracked her time. *See Davis*, 792 F.2d at 1276.

Focusing on defendant's knowledge, there is evidence in the record suggesting that the Company knew Ms. Richardson was working overtime. Ms. Malone acknowledged during her deposition that the position of business manager sometimes necessitated working more than 40 hours in a week. ECF 28-2 at 120. Ms. Malone also admitted that she knew Ms. Richardson

worked overtime. ECF 28-3 at 13. In fact, Ms. Malone expressed that she found Ms. Richardson's overtime to be "very high," given the Property's size. *Id.* Further, Alliance "admits that Ms. Malone was aware of occasional emails that were sent to Ms. Malone, or where Ms. Malone was copied on messages that were sent to others, outside Richardson's general office hours[.]" ECF 28-1 at 84, No. 15. Most significant, Ms. Richardson testified that Ms. Malone directed her not to log the full extent of her overtime. *See* ECF 28-2 at 23-24, Tr. 86-91; *id.* at 25, Tr. 95; *see, e.g.*, *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 803-04 (11th Cir. 2015) (holding that employer knew or should have known of under-reported time when supervisor explicitly instructed employee to work off-the-clock).

But, there is also sufficient evidence in the record to raise a genuine dispute of material fact as to the Company's knowledge of Ms. Richardson's hours. Ms. Malone testified that working beyond her regular schedule "was not a regular expectation" for Ms. Richardson. ECF 28-3 at 13. Further, Ms. Malone vigorously maintains that she never instructed Ms. Richardson to perform off-the-clock work or said anything that could be construed as a directive to manipulate her time records. ECF 28-3 at 1; ECF 35, ¶ 5. And, according to Ms. Malone, she never scrutinized Ms. Richardson's timesheets or asked Ms. Richardson if they were accurate. ECF 28-3 at 23-24. Therefore, a fact finder could reasonably conclude that Alliance was unaware that Ms. Richardson was working without pay.

Likewise, even viewing the record most favorably to Ms. Richardson, there is a genuine dispute as to Alliance's constructive knowledge of Ms. Richardson's overtime. On the one hand, a rational trier of fact could determine that Alliance should have known that Ms. Richardson was working uncompensated overtime. Text messages and emails show that Ms. Richardson and Ms. Malone communicated after work hours, including late at night. *See* ECF 31-1 at 15-17

(10/10/2017 email from Ms. Richardson to Ms. Malone at 10:48 p.m.; 10/18/2017 email from Ms. Richardson to Ms. Malone at 12:33 a.m.); *see also* ECF 30-1 at 21 (Ms. Richardson text to Ms. Malone at 8:15 p.m. that she would email Ms. Malone "brag points" soon); *id.* at 39-40 (email sent by Ms. Richardson to Ms. Malone at 10:30 p.m., stating "I was not able to do much in the office. Here is what I have and will continue to work on it this evening"); *id.* at 58 (Ms. Richardson email sent at 8:15 p.m., requesting approval from Ms. Karl for a resident event). Ms. Richardson kept Ms. Malone informed of the resident events that she organized, which Ms. Malone knew occurred in the evenings. ECF 28-3 at 39; ECF 30-1 at 19. Yet, despite Ms. Richardson communicating with Ms. Malone at hours outside her regular schedule, Ms. Malone admits that she never tried to confirm whether Ms. Richardson's timesheets accurately reflected her work hours. *See* ECF 28-2 at 23-24.

On the other hand, there is evidence in the record that the Company had no reason to believe Ms. Richardson was working unpaid overtime. The Company's Handbook stated that employees such as Ms. Richardson "should accurately record the time they begin and end their work," ECF 36-1 at 57, and that "[w]orking off the clock is prohibited, and no manager has the authority to require any Associate to do so." *Id.* at 27. Further, according to Ms. Malone, she had no reason to know the extent of Ms. Richardson's after-hours communication with residents because she told Ms. Richardson that doing so was not necessary. *See* ECF 35, ¶ 8 ("I actively discouraged Christina from making herself available to residents at all hours of the day."). This aligns with the Handbook, which instructs that "Alliance does not expect [employees] to answer emails and business related calls at all hours of the day or to use the devices outside of regular business hours other than for occasional business purposes." ECF 36-1 at 32.

Moreover, Ms. Richardson's texts and emails do not establish that Alliance should have known of Ms. Richardson's "*consistent* overtime work for a *long period* of time." *Butler*, 55 F. Supp. 3d at 803. The communications log that Ms. Richardson has submitted lists approximately 55 calls and emails sent by Ms. Richardson March 3, 2017 and October 31, 2017, during hours outside of her regular schedule. ECF 31-1 at 15-17. However, only about 15 of the communications involved Ms. Malone or Ms. Karl. *Id.* Likewise, many of the emails and texts that Ms. Richardson submitted do not appear to require Ms. Richardson to perform work. *See* ECF 30-1 at 9 (email from Ms. Karl at 9:58 p.m. introducing Ms. Richardson to a contractor); *id.* at 14 (texting "I'll see if Gordon can go up there" in response to a resident's text complaining of noise sent at 7:28 p.m.); *id.* at 16 (Ms. Richardson emailing Ms. Malone at 10:02 p.m. that she would respond to her question the following morning); *id.* at 33 (receiving email at 2:27 a.m. praising Ms. Richardson and Ms. Clark).

Ms. Richardson's time sheets also generate a genuine dispute of fact as to whether Alliance had constructive knowledge of her uncompensated hours. While Ms. Karl supervised Ms. Richardson, during which Ms. Richardson accurately recorded her hours, her biweekly earning statements reflect that she averaged 39.92 hours of regular work and 7.2 hours of overtime work per week. ECF 36-6 at 1-23. Ms. Richardson's earning statements for the months when she was managed by Ms. Malone show an average of 38.16 hours of regular work and 4 hours of overtime work per week. *Id.* at 24-50. Further, even after Ms. Malone allegedly directed Ms. Richardson not to record her overtime, Ms. Richardson continued to clock-in and out at times outside of her regular schedule and to utilize Time Correction Forms. *See* ECF 36-2 ECF 36-3. A juror could reasonably interpret these records to support either Ms. Richardson or Alliance.

In sum, because factual issues persist concerning Alliance's knowledge of Ms. Richardson's off-the-clock work, I shall deny the Motion as to Ms. Richardson's FLSA and MWHL claims.

## 2. Mr. Clark

Plaintiffs argue that Mr. Clark is entitled summary judgment because "there is no question Alliance was aware he was working overtime hours," given that Ms. Richardson "instructed him to work [overtime] hours, and told him that he would not be paid for them and that he should not record the time." ECF 28-1 at 10. In response, defendant asserts that the Handbook's policies give rise to a genuine issue of fact as to whether Ms. Richardson had apparent authority to encourage Mr. Clark to depress his reported overtime hours. ECF 34 at 33-35. And, the Company posits that there is a genuine dispute as to whether Mr. Clark performed off-the-clock work given evidence that he did not change his timekeeping practices after Ms. Malone became the regional manager. *See id.* at 36-37, 37 n.13.

Defendant's contention that it is insulated from liability because Ms. Richardson lacked actual or apparent authority to instruct Mr. Clark to manipulate his timesheets is not persuasive. To the contrary, "[k]nowledge may be imputed to the employer when its supervisors or management 'encourage[] artificially low reporting.'" *Bailey*, 776 F.3d at 801 (second alteration in original) (quoting *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827-28 (5th Cir. 1973)).

*Brennan*, 482 F.2d 825, is instructive. There, the district court found that the employer was liable under the FLSA because, although the employer's upper echelon management encouraged accurate timekeeping, the plaintiffs' immediate supervisors directed them to perform off-the-clock work. *Id.* at 827. The employer appealed, arguing that it could not have violated the

FLSA because it had no knowledge of the unreported overtime. *Id.* But, the former Fifth Circuit rejected that argument, reasoning that the employer "cannot disclaim knowledge when certain segments of its management squelched truthful responses." *Id.* at 828. The court concluded that "[b]ecause the immediate supervisors were primarily responsible for the employees' failing to report all overtime, . . . they may have had actual knowledge of the unreported overtime." *Id.* at 828. "At the very least,' the court explained, "[the employer] had constructive knowledge, for they had the opportunity to get truthful overtime reports but opted to encourage artificially low reporting instead." Accordingly, the court ruled that the district court did not err in finding that the employer had knowledge of the plaintiffs' overtime. *Id.* at 827.

Other courts have reached the same conclusion. *See, e.g.*, *Allen*, 495 F.3d at 1321-22 (finding genuine issue of fact as to school board's knowledge of unpaid overtime where principal's secretary instructed teachers to sign in at the time they were scheduled to arrive, not the actual time that they arrived); *Kuebel v. Black & Decker*, 643 F.3d 352, 363-64 (2d Cir. 2011) (finding plaintiff raised genuine issue of fact as to employer's knowledge where he testified that supervisors told him not to record more than forty hours of work); *Reich v. Dep't of Conservation & Nat. Res., St. of Ala.*, 28 F.3d 1076, 1083-84 (11th Cir. 1994) (police department had constructive knowledge of overtime where it "specifically instructed its supervisors to closely monitor the officers' hours to ensure compliance with the [department's] policy"); *Meadows v. NCR Corp.*, 16CV6221, 2017 WL 5192009, at *9 (N.D. Ill. Nov. 9, 2017) ("Direction or pressure from a supervisor is sufficient here to raise an issue of material fact about [the employer's] constructive knowledge of [the plaintiff's] off-the-clock work."); *Carman v. Meritage Homes Corp.*, 37 F. Supp. 3d 860, 868 (S.D. Tex. 2014) (rejecting employer's contention that it lacked constructive knowledge where plaintiff testified that her supervisor instructed her not to report overtime).

Here, there is no dispute that Ms. Richardson acted as Mr. Clark's direct supervisor for the entirety of his employment at Alliance. ECF 28-1 at 82, No. 6. Therefore, pursuant to the Handbook, Ms. Richardson was responsible for setting Mr. Clark's hours and for authorizing his overtime hours. *Id.* at No. 8; see also ECF 36-1 at 57. Both Ms. Richardson and Mr. Clark testified that Ms. Richardson informed Mr. Clark that he would not be compensated for overtime work. *See* ECF 28-2 at 13, Tr. 49; ECF 29-1 at 14-15, Tr. 106-113. And, Ms. Malone admits that she never checked with Mr. Gordon to determine the accuracy of his timekeeping sheets. ECF 28-3 at 24. Therefore, there is no genuine dispute of fact that Alliance had actual or constructive notice that Mr. Clark was working uncompensated overtime.

However, Mr. Clark is not entitled to summary judgment because there is a genuine issue of fact concerning the number of hours of work that he performed but for which he was not paid. As noted, a plaintiff carries his burden under *Mt. Clemens* "if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687. Although the plaintiff need not prove the number of uncompensated hours worked with exactitude, speculation will not do. *McLaughlin*, 436 F. Supp. 2d at 738.

The parties dispute that Mr. Clark performed ten hours of uncompensated overtime on a weekly basis. *Compare* ECF 28-1 at 14-15, *with* ECF 34 at 37 n.13. Mr. Clark testified that while working at Alliance he recorded overtime for tasks that he considered "major," but not for those tasks that took fewer than 20 minutes to complete. ECF 29-1 at 12-13, Tr. 98-104. And, Mr. Clark stated in his interrogatory responses that he worked roughly 50 hours each week between January 2017 and October 2017, but was not compensated for the approximately ten hours of weekly overtime. ECF 28-1 at 76, No. 10.

But, Mr. Clark admitted during his deposition that his timekeeping practices did not change following his conversation with Ms. Richardson about overtime pay. ECF 29-1 at 19, Tr. 129. This admission is bolstered by Mr. Clark's timekeeping records, which reflect that he recorded an average of eight hours of overtime work per week during the relevant period. ECF 28-1 at 87-120. Those records also show that while Ms. Malone supervised the Property, Mr. Clark used Time Correct Forms and reporting working during hours outside of his regular schedule. *See* ECF 36-4. Thus, defendant has pointed to evidence raising a genuine issue that Mr. Clark performed ten hours of uncompensated overtime each week. *See, e.g., Bonilla v. Dops, Inc*., GJH-14-2055, 2016 WL 828096, at * 5 (D. Md. Feb. 29, 2016) (denying plaintiff summary judgment where evidence provided by plaintiff revealed a genuine dispute of material fact regarding the number of hours worked per week); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243-44 (D. Md. 2012) (denying plaintiff summary judgment because "[w]ith a fact as basic as the number of hours worked by Plaintiffs in dispute, it cannot be found that any overtime wages were owed").

Accordingly, Mr. Clark is not entitled to summary judgment as to his FLSA and MWHL claims.

## IV.    Conclusion

For the foregoing reasons, I shall DENY plaintiffs' Motion for Partial Summary Judgment (ECF 28).

A separate Order follows.


Date:   February 4, 2020                                    _____/s/_____
                                                           Ellen Lipton Hollander
                                                           United States District Judge