IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTINA RICHARDSON, *et al.*,
*Plaintiffs*

v.                                              Civil Action No. ELH-18-1114

ALLIANCE RESIDENTIAL
COMPANY,
*Defendant.*

## MEMORANDUM OPINION

Plaintiffs Christina Richardson and Gordon Clark filed suit against their former employer, defendant Alliance Residential Company ("Alliance" or the "Company"). ECF 1. They alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and corresponding provisions under Maryland law. *See* Md. Code (2016 Repl. Vol., 2017 Supp.), § 3-401 *et seq.* of the Labor & Employment Article. Following discovery, plaintiffs moved for partial summary judgment. ECF 28. In a Memorandum Opinion (ECF 40) and Order (ECF 41) of February 4, 2020, I denied plaintiffs' motion.

Alliance has filed a motion (ECF 42) seeking "an Order clarifying and/or reconsidering one of the findings/conclusions contained" in the Court's Memorandum Opinion. *Id.* at 1. Specifically, the Company seeks to clarify whether the Memorandum Opinion forecloses it from arguing at trial that it lacked knowledge that Mr. Clark worked overtime, without pay. *See id.* at 1-2. If so, Alliance asks the Court to revisit its ruling. *Id.* at 4. The Company's motion is supported by a memorandum of law. ECF 42-1 (collectively, the "Motion" or "Motion to Reconsider"). Plaintiff opposes the Motion (ECF 43), and Alliance has replied. ECF 44.

No hearing is necessary to resolve the Motion to Reconsider. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

# I.   Background

## A.   Factual Background[1]

Alliance, a property management company, manages an 82-unit apartment building located on East Saratoga Street in Baltimore (the "Property").   ECF 3 (Answer), ¶ 4; *see also Our Company*, ALLIANCE RESIDENTIAL COMPANY, http://www.allresco.com/ (last visited Jan. 23, 2020).   An on-site "business manager" oversees the Property's day-to-day operations, such as marketing and leasing, collecting rent, managing on-site staff, and interfacing with residents.   ECF 28-1 (Elizabeth Karl Deposition) at 23, Tr. 7, 9.   Generally, the business manager reports to a "regional manager," who, in turn, is supervised by a "regional vice president."   *Id.* at 23, Tr. 7.

Ms. Richardson served as the Property's business manager from April 18, 2016 to November 1, 2017.   ECF 28-1 (Richardson Answers to Interrogatories) at 60, No. 2.   When Ms. Richardson began working at Alliance, the Company lacked a regional manager.   As a result, Ms. Richardson was supervised by regional vice president Elizabeth Karl.   ECF 28-1 at 23, Tr. 8.   In December 2016, Alliance hired Sarah Malone as a regional manager.   As of that time, Ms. Malone supervised Ms. Richardson until Ms. Richardson left employment with Alliance.   *Id.*; *see also* ECF 28-1 at 60, No. 2.

Mr. Clark worked as the Property's on-site service supervisor from approximately October 2016 to October 2017.   ECF 28-1 (Clark Answers to Interrogatories) at 71, No. 2; *see also* ECF 28-3 (Clark Deposition) at 110, Tr. 12; *id.* at 115, Tr. 32.   Employed as an hourly worker, Mr. Clark's regular hours were Monday through Friday from 8:00 a.m. to 4:00 p.m.   ECF 28-1 at 81,

---

[1] The facts underlying this dispute are set forth in the Memorandum Opinion of February 4, 2020.   ECF 40.   Those facts are incorporated herein.   The facts presented in this Memorandum Opinion are limited to those pertinent to the Motion to Reconsider.

No. 2; ECF 29-1 (Clark Deposition) at 4, Tr. 67.[2]  Mr. Clark was supervised by Ms. Richardson throughout his time at Alliance.  ECF 28-1 (Alliance Admissions) at 82, No. 6; *see also* ECF 28-1 at 25, Tr. 16.  Per the Company's policy, Ms. Richardson, as Mr. Clark's direct supervisor, was responsible for approving Mr. Clark's overtime work.  ECF 28-1 at 33, Tr. 46.

When Alliance hired Ms. Richardson and Mr. Clark, it provided them with a copy of its Associate Handbook (the "Handbook").  ECF 28-2 at 6, Tr. 20-21; ECF 29-1 at 3-4, Tr. 65-66.  Plaintiffs agreed to read the Handbook and become familiar with its provisions.  *Id.*  The Handbook advised employees that federal and state law require accurate timekeeping, and that Alliance had implemented timekeeping procedures for employees to record and submit accurate time records.  *See* ECF 36-1 (Alliance Handbook) at 27.  The Handbook stated, in part, *id.*:

> **Accurate Time.** Accurately recording time worked is the responsibility of every Associate. Federal and state laws require the Company to keep an accurate record of time worked in order to calculate Associate pay and benefits. Time worked is all the time actually spent on the job performing assigned duties. Associates are expected to regularly arrive at work on time, ready to work. Associates will be disciplined for excessive and/or unexcused absences. Non-exempt Associates should accurately record the time they begin and end their work, as well as the beginning and ending time of each meal period. They also should record the beginning and ending time of any split shift or departure from work for personal reasons.

Further, the Handbook contained a section titled "**OVERTIME PAY FOR NON-EXEMPT ASSOCIATES**."  *Id.* at 57 (emphasis in original).  The section provided, *id.*:

> a. **Prior Approval.**  Non-exempt Associates may be required to work overtime at their Supervisor's request.  All overtime requires the prior approval of the Associate's Supervisor or Manager.  Associates who work overtime without prior approval will be paid in accordance with the law, however, may be subject to disciplinary action up to and included termination for violating the prior approval requirement.

---

[2] At his deposition, Mr. Clark testified that he believed that his work schedule did not include a break for lunch.  ECF 29-1 at 4, Tr. 67-68.  Although not entirely clear, it appears that Ms. Richardson received an unpaid lunch break.  ECF 28-2 at 8, Tr. 29.

b. **<u>Record All Hours Worked</u>**. If your position is classified as non-exempt, you must record all hours worked. Working off the clock is prohibited, and no manager has the authority to require any Associate to do so. Any Associate who works off the clock or any manager that requests an Associate work off the clock may be subject to disciplinary action up to and including termination.

c. **<u>Miscellaneous</u>**. To respect each Associate's personal schedule, every effort will be made to minimize unwanted overtime. However, business demands are such that overtime may be required as a condition of employment. The company pays overtime in accordance with applicable federal and state laws. "Hours worked" <u>does not</u> include paid time off for holidays, vacation, illness, inclement weather, jury duty or bereavement.

Mr. Clark acknowledged at his deposition that he had read the Handbook. ECF 29-1 at 7, Tr. 78-79; *see id.* at 3-4, Tr. 65-57. When asked if he "understood that it was the company's policy that 'working off the clock is prohibited and no manager has the authority to require an associate to do so,'" Mr. Clark responded: "Yeah. I mean, its—it says it here." *Id.* at Tr. 79.

According to plaintiffs, Ms. Malone met with Ms. Richardson in February 2017, and instructed Ms. Richardson not to record more than forty hours of work per week. *See* ECF 28-2 at 16, Tr. 16; *see id.* at 18, Tr. 18. Ms. Richardson testified at her deposition that Ms. Malone said: "[Alliance] didn't have any money right now to pay overtime, my hours that I could get paid for were 9:00 to 5:00, but my job description expectations did not change." *Id.* at 25, Tr. 97; *see also id.* at 26, Tr. 100 ("[S]he stated that I could only basically get paid from 9:00 to 5:00, but my expectations and me being on call, none of that was changing."). Further, Ms. Richardson testified that she knew Ms. Malone's directive violated Alliance's policies. *Id.* at 29, Tr. 112. But, she did not report the conversation to Ms. Karl or to the Company's human resources department because she was worried that doing so could lead to her termination. *Id.* at 29, Tr. 112-13; *see also id.* at 30, Tr. 115.

Shortly after Ms. Richardson met with Ms. Malone in February 2017, Ms. Richardson spoke with Mr. Clark. ECF 28-2 at 13, Tr. 49; *see* ECF 29-1 at 14-15, Tr. 106-113. According to

Mr. Clark, Ms. Richardson indicated that she had just talked to Ms. Malone.  ECF 29-1 at 14, Tr. 109.  Both Ms. Richardson and Mr. Clark testified that Ms. Richardson then told Mr. Clark that he could not record more than 40 hours of work per week on his timecard.  ECF 28-2 at 13, Tr. 48; ECF 29-1 at 15, Tr. 110, 113.  Mr. Clark testified that he became upset and walked away from Ms. Richardson, ending the conversation.  ECF 29-1 at 16, Tr. 114.  Mr. Clark never spoke directly with Ms. Malone about his overtime work.  *Id.* at 13, Tr. 105.

Mr. Clark maintains that when Ms. Karl supervised Ms. Richardson, Mr. Clark would record time for work occurring outside of his regular hours when he considered it a "major" task, such as a repair that took an hour or more to complete.  ECF 29-1 at 12, Tr. 98; *see id.* at 19, Tr. 128-29.  In contrast, he did not record "minor" tasks that took 15-20 minutes or less, such as assisting a resident who was locked out of an apartment.  *Id.* at 12, Tr. 98-100.

Following Mr. Clark's conversation with Ms. Richardson, Mr. Clark claims that he worked 50 hours per week: 40 regular hours between Monday and Friday and an additional 10 hours of overtime work on the evenings or weekends.  ECF 28-1 at 71, No. 2.  However, Mr. Clark admitted during his deposition that he did not change how he recorded his hours after talking to Ms. Richardson.  That is, he continued to record hours outside of his regular schedule for "major" tasks, but not for minor tasks.  ECF 29-1 at 19, Tr. 129; *see also id.* at 12, Tr. 98-101.

Mr. Clark resigned from Alliance in October 2017, and Ms. Richardson left on November 1, 2017.  ECF 28-1 at 60, No. 2.  Mr. Clark seeks $14,944.20 for the ten hours of overtime that he alleges he worked each week, without compensation, from February 1, 2017 to October 27, 2017.  ECF 28-1 at 76, No. 10.  Ms. Richardson seeks compensation for 51.5 hours of overtime pay for a period of 36 weeks.  *See* ECF 28-1 at 76, No. 10; ECF 28-2 at 48, Tr. 189.  The Motion implicates the Court's ruling only as to Mr. Clark.

## B.  Procedural History

Plaintiffs filed suit on April 17, 2018.  ECF 1.  On July 20, 2018, after defendants answered the Complaint, the Court issued a Scheduling Order.  ECF 8.  It set, *inter alia*, a deadline of December 17, 2018 to complete discovery, and January 29, 2019, as the deadline for filing dispositive pretrial motions.  *Id.*  Following several extensions, dispositive motions were due by June 11, 2019.  *See* ECF 27.

On that date, plaintiffs moved for partial summary judgment, asserting, *inter alia*, that there was no genuine dispute of material fact and that Alliance was liable to plaintiffs for unpaid overtime hours.  ECF 28.  The motion was supported by several hundred pages of exhibits.  *See* ECF 28-1 at 21-120; ECF 29-1; ECF 30-1; ECF 31-1.  As to the FLSA, plaintiffs argued that Alliance violated the FLSA because "Plaintiffs' supervisors knew that Plaintiffs were working overtime hours but failed to ensure that the hours were recorded properly or take affirmative action to stop them from doing so."  ECF 28-1 at 6.  With respect to Mr. Clark, plaintiffs asserted that "there is no question Alliance was aware he was working overtime hours," given that Ms. Richardson, Mr. Clark's supervisor, "instructed him to work [overtime] hours, and told him that he would not be paid for them and that he should not record the time."  ECF 28-1 at 10.

Alliance filed an opposition to the motion and submitted its own exhibits.  ECF 34; ECF 35; ECF 36.  The Company asserted that Mr. Clark was not entitled to summary judgment "because the evidence demonstrates that he did not have an objectively reasonable basis for concluding that Christina Richardson had actual authority or apparent authority to instruct him to work off the clock."  ECF 34 at 35.  Ms. Richardson lacked actual authority, Alliance contended, because the Handbook was clear that a supervisor could not instruct a subordinate to perform unrecorded work.

*Id.* And, Ms. Richardson lacked apparent authority, according to Alliance, because Mr. Clark had read the Handbook and knew Alliance's policies. *Id.*

As indicated, I denied plaintiffs' motion in a Memorandum Opinion (ECF 40) and Order (ECF 41) of February 4, 2020. Of relevance here, I rejected Alliance's "contention that it is insulated from liability [as to Mr. Clark] because Ms. Richardson lacked actual or apparent authority to instruct Mr. Clark to manipulate his timesheets." ECF 40 at 26. I explained: "'Knowledge may be imputed to the employer when its supervisors or management encourage[] artificially low reporting.'" *Id.* (internal quotation marks omitted) (quoting *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 803-04 (11th Cir. 2015)).

The case of *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973), was "instructive" on this point. ECF 40 at 26. I stated, *id.* 26-27:

> There, the district court found that the employer was liable under the FLSA because, although the employer's upper echelon management encouraged accurate timekeeping, the plaintiffs' immediate supervisors directed them to perform off-the-clock work. *Id.* at 827. The employer appealed, arguing that it could not have violated the FLSA because it had no knowledge of the unreported overtime. *Id.* But, the former Fifth Circuit rejected that argument, reasoning that the employer "cannot disclaim knowledge when certain segments of its management squelched truthful responses." *Id.* at 828. The court concluded that "[b]ecause the immediate supervisors were primarily responsible for the employees' failing to report all overtime, . . . they may have had actual knowledge of the unreported overtime." *Id.* at 828. "At the very least,' the court explained, "[the employer] had constructive knowledge, for they had the opportunity to get truthful overtime reports but opted to encourage artificially low reporting instead." Accordingly, the court ruled that the district court did not err in finding that the employer had knowledge of the plaintiffs' overtime. *Id.* at 827.

In light of *Brennan* and analogous cases, I concluded that Ms. Richardson's knowledge of Mr. Clark's overtime work was imputable to Alliance. *Id.* at 28. I reasoned, *id.*:

> Here, there is no dispute that Ms. Richardson acted as Mr. Clark's direct supervisor for the entirety of his employment at Alliance. ECF 28-1 at 82, No. 6. Therefore, pursuant to the Handbook, Ms. Richardson was responsible for setting Mr. Clark's hours and for authorizing his overtime hours. *Id.* at No. 8; *see also*

ECF 36-1 at 57.  Both Ms. Richardson and Mr. Clark testified that Ms. Richardson informed Mr. Clark that he would not be compensated for overtime work.  *See* ECF 28-2 at 13, Tr. 49; ECF 29-1 at 14-15, Tr. 106-113.  And, Ms. Malone admits that she never checked with Mr. Gordon to determine the accuracy of his timekeeping sheets.  ECF 28-3 at 24.  Therefore, there is no genuine dispute of fact that Alliance had actual or constructive notice that Mr. Clark was working uncompensated overtime.

Nonetheless, I found that Mr. Clark was not entitled to summary judgment "because there is a genuine issue of fact concerning the number of hours of work that he performed but for which he was not paid."  ECF 40 at 28.  Accordingly, I denied plaintiffs' summary judgment motion as to Mr. Clark.  *See* ECF  41.

The Motion to Reconsider followed on February 18, 2020.  ECF 42.

## II.    Standards of Review

Although Alliance cites only Local Rule 105.10 in its Motion, a motion to reconsider an interlocutory order such as one denying summary judgment is governed by Rule 54(b) of the Federal Rules of Civil Procedure.  *See U.S. Tobacco Coop., Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th Cir. 2018);  *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003).[3]  Under Rule 54(b), any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

The Fourth Circuit has distinguished between Rule 54(b) and Rule 59(e), which governs reconsideration of final judgments, explaining that Rule 54(b) "involves broader flexibility" to

---

[3] Plaintiffs filed the Motion pursuant to Local Rule 105.10. With exceptions not applicable here, Local Rule 105.10 provides that "any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order."  There is no contention here that the Motion is untimely.

account for new facts and arguments as the litigation unfolds.  *See Carlson*, 856 F.3d at 325; *Am. Canoe Ass'n*, 326 F.3d at 514-15.  However, the Fourth Circuit has admonished that "the discretion afforded by Rule 54(b) 'is not limitless,'" and the Court has "'cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case.'"  *Tobacco Coop.*, 899 F.3d at 256 (quoting *Carlson*, 856 F.3d at 325).

The law of the case doctrine  "generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Musacchio v. United States*, ___ U.S. ___, 136 S. Ct. 709, 716 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)); *accord Arizona v. California*, 460 U.S. 605, 618 (1983); *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019); *Carlson*, 856 F.3d at 325; *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009).  The doctrine's effect is to bar a party from resurrecting issues that were previously decided or "'decided by necessary implication.'" *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (quoting *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988)).  In so doing, the law of the case doctrine advances the interests of efficiency, judicial economy, and finality.  *See Christianson v. Colt Indus. Oper. Corp.*, 486 U.S. 800, 816 (1988) (observing that the doctrine safeguards the "efficiency of the judicial process by protecting against the agitation of settled issues"); *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 257 (D.C. Cir. 2015) (noting that the law of the case "reflects the understanding that 'inconsistency is the antithesis of the rule of law'") (citation and alteration omitted).

When applied to a court's prior interlocutory rulings, the law of the case doctrine "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation."  *Sejman*, 845 F.2d at 68 (citation omitted).  Accordingly, the Fourth Circuit has instructed that a court should revise an interlocutory order only to account for "'(1) a subsequent

trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error

causing manifest injustice.'" *Tobacco Coop.*, 899 F.3d at 256 (quoting *Carlson*, 856 F.3d at 325).

In this setting, the Fourth Circuit has colorfully explained that to be clearly erroneous the decision

cannot be "'just maybe or probably wrong; it must . . . strike [the court] as wrong with the force

of a five-week-old, unrefrigerated dead fish.'"   *TFWS, Inc.*, 572 F.3d at 194 (first alteration in

original) (citation omitted).   In short, the decision must be "'dead wrong.'"  *Id.* (citation omitted).

### III.   Discussion

Alliance assigns no error to the Court's Order denying summary judgment to Mr. Clark

with respect to his FLSA claim.   Nor does the Company quarrel with the Court's determination

that there is a genuine dispute of material fact as to whether Mr. Clark performed unpaid overtime

work and, if so, how many hours he worked.   Rather, Alliance takes issue with the Court's analysis

in   the   Memorandum   Opinion   concerning   the   Company's   knowledge   of   Mr.   Clark's

uncompensated work.   ECF 42 at 1-2.

In particular, Alliance contends that it is "unclear" whether the Court has precluded it from

arguing at trial that Ms. Richardson's knowledge of Mr. Clark's unpaid work is not imputable to

the Company because Ms. Richardson had no authority to direct Mr. Clark to underreport his hours.

ECF 42-1 at 6.  If the answer is "yes," *i.e.*, if the Company is foreclosed from making that argument,

then the Company urges the Court to set aside that ruling.  *See id.* at 9-13.  According to Alliance,

it should be able to argue to a jury that because the Handbook stripped Ms. Richardson of authority

to instruct Mr. Clark to work off the clock, and because Mr. Clark knew Ms. Richardson lacked

such authority, Ms. Richardson's knowledge of Mr. Clark's unpaid overtime cannot be imputed to

the Company.  *See id.*

In plaintiffs' view, "[t]here is nothing to clarify or reconsider."  ECF 43 at 2.   They argue

that Ms. Richardson had actual authority over Mr. Clark's hours, and that Mr. Clark understood Ms. Richardson merely to be conveying Ms. Malone's directive. *Id.* at 1-2. Therefore, plaintiffs maintain that it is "uncontested" that "Ms. Richardson had knowledge of Mr. Clark's overtime hours worked, which knowledge is imputed to Defendant." *Id.* at 2.

To start, in the Memorandum Opinion, I squarely rejected the Company's reliance on agency principles. In my view, the Memorandum Opinion was clear: "Defendant's contention that it is insulated from liability because Ms. Richardson lacked actual or apparent authority to instruct Mr. Clark to manipulate his timesheets is not persuasive." ECF 40 at 26. I explained that courts have consistently held that where a supervisor encourages subordinates to falsify their time records, the supervisor's knowledge of unpaid work is imputable to the employer. *See id.* That was the case here, I observed, because, "pursuant to the Handbook, Ms. Richardson was responsible for setting Mr. Clark's hours and for authorizing his overtime hours" and "[b]oth Ms. Richardson and Mr. Clark testified that Ms. Richardson informed Mr. Clark that he would not be compensated for overtime work." *Id.* at 28.

Therefore, I found that "there is no genuine dispute of fact that Alliance had actual or constructive notice that Mr. Clark was working uncompensated overtime." *Id.* In this respect, the Memorandum Opinion needs no clarification. Accordingly, I turn to consider whether to revise my conclusion that Alliance in fact knew of Mr. Clark's unpaid work.

There is no claim of an intervening change in the law, and no presentation of new evidence, Therefore, I must determine whether my analysis amounted to clear error causing manifest injustice. *See Henslee v. Union Planters Nat. Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").

The FLSA provides that "no employer shall employ" a covered employee in excess of forty hours in a given week unless the employee is paid at "a rate not less than one and one-half times the regular rate at which he is employed" for each additional hour worked.  29 U.S.C. § 207(a)(1); *see Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 136 S. Ct. 2117, 2121 (2016); *U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 280 (4th Cir. 2019). To "employ" is defined in the FLSA as "to suffer or permit to work."  29 U.S.C. § 203(g).  The employer's knowledge of the work is an element of a FLSA claim that the plaintiff must establish to recover.  *See Bailey v. Cty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996); *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988); *Davis v. Food Lion*, 792 F.2d 1274 (4th Cir. 1986).

The broad definition of "employ" places the onus on the employer to "exercise its control and see that the work is not performed if it does not want it to be performed."  29 C.F.R. § 785.13. Thus, employers must "pay for all work they know about, even if they did not ask for the work, even if they did not want the work done, and even if they had a rule against doing the work."  *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017); *see also Chao v. Gotham Registry*, Inc., 514 F.3d 280, 288 (2d Cir. 2008) (collecting cases).  Conversely, the law "'stops short of requiring the employer to pay for work it did not know about, and had no reason to know about.'"  *Allen*, 865 F.3d at 938 (citation omitted).  In other words, an employer is liable under the FLSA only if it had actual or constructive knowledge of the employee's overtime work.  *Id.*

In assessing whether a plaintiff has met his burden, courts have regularly found that a supervisor's knowledge of the plaintiff's overtime work is imputable to the employer.  *See* ECF 40 at 26-27 (collecting cases).  For example, in *Allen v. Board of Public Education*, 495 F.3d 1306 (11th Cir. 2007), the Eleventh Circuit held that several plaintiffs had raised a genuine issue of material fact as to the employer's actual knowledge of unpaid work where their supervisor told

them that they could not be paid overtime but observed them working beyond their scheduled hours. *Id.* at 1319. Similarly, in *Kuebel v. Black & Decker*, 643 F.3d 352 (2d Cir. 2011), the Second Circuit found the plaintiff had raised a genuine issue of fact as to the employer's knowledge where he testified, *inter alia*, that supervisors instructed him not to record more than forty hours per week. *Id.* at 356-57, 365. Notably, the employers in these cases implemented policies to promote compliance with the FLSA. *See, e.g.*, *Kuebel*, 643 F.3d at 356 (requiring employees to accurately record their hours and encouraging employees to report violations of company policies).

Alliance concedes that the decisions are "similar" in that the employers in those cases had policies requiring accurate timekeeping. ECF 42-1 at 11. But, the Company seeks to distinguish this case, asserting that "none of the employers in the precedent decisions had policies in place that expressly deprived supervisors of the authority to instruct an employee to not record all overtime hours." *Id.* As a result, "none of these cases discuss the legal doctrine of actual/apparent authority." *Id.* In contrast, the Company maintains that "Alliance not only has demonstrated that it denied this authority to its managers, Alliance also has demonstrated that Mr. Clark knew about this limitation on authority, and he understood it." *Id.* It follows, Alliance contends, that a jury should decide whether Ms. Richardson's knowledge can be imputed to the Company, given that she exceeded the scope of her authority when she instructed Mr. Clark to undercount his hours. *See id.* at 13.

It is true that federal statutes are ordinarily read against a backdrop of common law agency principles. *See Krakauer v. Dish Network, LLC*, 925 F.3d 643, 659 (4th Cir. 2019) (assuming that "federal statutes are written with familiar common law agency principles in mind"); *see, e.g.*, *Campbell-Ewald Co. v. Gomez*, ___ U.S. ___, 136 S. Ct. 663, 674 (2016) (applying "federal common-law principles of agency" to the Telephone Consumer Protection Act); *Vance Ball State*

*Univ.*, 570 U.S. 421, 428 (2013) (Title VII); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444-45 (2003) (ADA); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1993) (ERISA); *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 567 (1982) (antitrust law). Yet, because "'federal statutes are generally intended to have uniform nationwide application,'" courts apply a "federal rule of agency," not state law. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989) (citation omitted). For guidance, courts turn to the Restatement of Agency. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 755 (1998) (describing the Restatement as a "useful beginning point for a discussion of general agency principles"); *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018) (observing that "courts have traditionally looked to the Restatement of Agency" to derive a federal common law of agency).

Under traditional principles of agency law, the agent acts as a representative of the principal, who, in turn, has the right to control the agent's actions. *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006). An agency relationship can arise in one of two ways: actual or apparent authority. A principal confers actual authority on an agent when "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id.* § 2.01. An agency relationship predicated on apparent authority is formed "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03.

As a result of the agency relationship, the legal consequences of an agent's actions are attributable to the principal when the agent acts within the scope of his or her authority. *Id.* § 7.04 cmt. b; *see, e.g.*, *Meyer v. Holley*, 537 U.S. 280, 285 (2003) (discussing applicability of vicariously liability principles to Fair Housing Act). The rule "creates incentives for a principal to choose

14

agents carefully and to use care in delegating functions to them." RESTATEMENT, *supra*, § 5.03 cmt. b.

According to the Restatement, an employee "acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Id.* § 7.07. In contrast, an "employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Id.* Notably, the Restatement teaches that "conduct is not outside the scope of employment merely because an employee disregards the employer's instructions." *Id.* cmt. c. For instance, if a delivery company directs its employee to transport a package with instructions to drive the speed limit and the employee speeds resulting in an accident, the company is nonetheless liable because the employee's conduct "is compatible with acting in an assigned role to do an assigned task." *Id.*

Generally, where the agent acquires information in furtherance of the agent-principal relationship, that knowledge is deemed known by the principal. *Id.* § 5.03; *see, e.g.*, *Am. Sur. Co. v. Pauly*, 170 U.S. 133, 153 (1898) ("It is the rule that the knowledge of the agent is the knowledge of his principal . . . ."). The Restatement, however, imposes two limitations on the imputation principle. First, "[t]he scope of an agent's duties delimits the content of knowledge that is imputed to the principal." RESTATEMENT, *supra*, § 5.03. Thus, an agent's knowledge that he "acted or intends to act in a manner unauthorized by the principal is not imputed to the principal." *Id.* Similarly, an agent's knowledge is "not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." *Id.* § 5.04. Second, even if knowledge lies within the scope of an employee's duties, it is imputed to the principal only if material to the agent's duties. *Id.* Stated differently,

15

the employee's knowledge of a fact may be imputed to the employer only if it is of import to the agent's duties.

Although neither party addresses the applicability of agency principles to the FLSA, the Supreme Court has instructed that "'[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.'" *United States v. Bestfoods*, 524 U.S. 51, 63 (1998) (alteration in *Bestfoods*) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). Therefore, a federal statute will not displace traditional agency principles absent clear indication from Congress. *See, e.g.*, *In re Crescent City Estates, LLC*, 588 F.3d 822, 826 (4th Cir. 2009) (finding that fee-shifting provision in removal statute clearly replaced the American Rule); *DiFelice v. U.S. Airways, Inc*., 397 F. Supp. 2d 758, 780 (E.D. Va. 2005) (concluding that ERISA supplanted traditional agency principles because it directly addresses the liability of a fiduciary to plan members).

The FLSA is silent with regard to agency principles; it evinces no congressional intent to supersede agency common law. And, notably, other courts have applied the rules of agency to the FLSA, albeit in circumstances different from those presented here. *See Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1244-45 (11th Cir. 2002) (concluding that the FLSA did not require farm owners to reimburse farmworkers for fees charged by recruiters where the allegations failed to support the creation of apparent authority between the farm owners and recruiters); *see also Ulloa v. Fancy Farms, Inc*., 762 F. App'x 859, 866 (11th Cir. 2019). Accordingly, Alliance is correct that the FLSA does not supersede agency common law.

To be sure, the existence of an agent-principal relationship and the scope of an agent's authority are factual questions and so are ordinarily within the purview of the factfinder. *See, e.g.*, *Ashland Facility Operations, LLC v. NLRB*, 701 F.3d 983 (4th Cir. 2012) (citing *Metco Prods.,*

*Inc. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989)).  Here, however, it is undisputed that Alliance delegated to Ms. Richardson the authority to supervise Mr. Clark, which included the extent of any overtime he worked.

The Handbook states: "All overtime requires the prior approval of the Associate's Supervisor or Manager."  ECF 36-1 at 57.  Indeed, the Handbook warns: "Associates who work overtime without prior approval . . . may be subject to disciplinary action up to and included termination for violating the prior approval requirement."  *Id.*  Moreover, Ms. Karl acknowledged during her deposition that, according to Company policy, Mr. Clark would check with Ms. Richardson, not with her or Ms. Malone, for approval to work more than forty hours in a week. ECF 28-1 at 33, Tr. 46.  Thus, there can be no dispute that Ms. Richardson had actual authority to manage Mr. Clark's hours, including the decision to permit Mr. Clark to work overtime.

Alliance disputes the conclusion that Ms. Richardson's knowledge can be imputed to it, insisting that the Handbook deprived Ms. Richardson of the authority to require Mr. Clark to falsify his timesheets, and Mr. Clark knew that such a command contravened Company policy.  *See* ECF 42-1 at 7.  Certainly, Alliance is correct that, pursuant to the Handbook, Ms. Richardson's alleged conduct violated its policies.  *See* 36-1 at 57 (stating that "[w]orking off the clock is prohibited, and no manager has the authority to require any Associate to do so").  But, Alliance misses the proverbial forest for the trees.  Whether Ms. Richardson's knowledge of Mr. Clark's unpaid work is imputable to Alliance turns on whether Ms. Richardson had authority over Mr. Clark's hours generally, not her authority specifically to direct Mr. Clark to work-off-the-clock.

It is illustrative to consider two hypothetical scenarios.  First, imagine that Ms. Richardson tells Mr. Clark not to record his hours and he listens, but Ms. Richardson and Mr. Clark are similarly situated peers, not supervisor and subordinate.  In that circumstance, Ms. Richardson is

not an agent of Alliance with respect to Mr. Clark's hours; she can neither limit him to forty hours of work nor order him to work in excess of forty hours.  Consequently, her knowledge of Mr. Clark's unpaid labor would not be imputable to the Company.  In another scenario, Ms. Richardson, as Mr. Clark's supervisor, learns that Mr. Clark is consistently working unrecorded overtime and makes no effort to stop him from doing so, nor does she ensure the accuracy of his timesheets.  In that circumstance, Ms. Richardson's knowledge is plainly imputable to the Company: Alliance delegated control of Mr. Clark's hours to Ms. Richardson and so Ms. Richardson's knowledge of Mr. Clark's overtime is within the scope of her authority.  That is so even if she never discussed overtime with Mr. Clark.  In sum, Ms. Richardson's authority to order Mr. Clark to work-off-the-clock is immaterial; what matters is her authority to control Mr. Clark's work hours.

Notably, Alliance has not cited a FLSA decision that supports its position that where supervisors act in violation of the employer's policies, their conduct is not imputable.  Nor has the Court uncovered such a case.  To the contrary, those courts that have considered the issue focus on whether the knowledgeable individual was a manager, not the precise scope of his or her authority. *See, e.g.*, *Bailey v. TitleMax of Ga., Inc.*, 776 F. 3d 797, 802 (11th Cir. 2015) ("Knowledge may be imputed to the employer when its supervisors or management 'encourage artificially low reporting.'") (alteration and citation omitted); *Kuebel*, 643 F.3d at 363-64 (observing that plaintiff asserted that "managers instructed him not to record more than forty hours per week" and that "it was [defendant], through its managers, that caused the inaccuracies in his timesheets"); *Allen*, 495 F.3d at 1316 (finding genuine issue as to knowledge where employee's "supervisor told her that she could not be paid overtime, but observed her working beyond her scheduled hours"); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) ("any official" of the employer);

*Brennan*, 482 F. 2d at 828 ("immediate supervisor," or "management").

Moreover, Alliance's position is irreconcilable with the FLSA's capacious definition of "employ," which imposes on an employer a non-delegable duty to prevent unwanted work.  *See Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008) ("An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance."); *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) ("The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted."); *Forrester*, 646 F.2d at 414 (holding that an employer "cannot stand idly by and allow an employee to perform overtime work without proper compensation").

And, Alliance's position is at odds with Department of Labor regulations, which make manifest that policies alone are insufficient to insulate an employer from FLSA liability.  *See* 29 C.F.R. § 785.13 ("The mere promulgation of a rule against [unwanted] work is not enough. Management has the power to enforce the rule and must make every effort to do so.").  Alliance offers no sound basis to distinguish its policy prohibiting management to order off-the-clock work from others, such as requiring employees to obtain preapproval to perform overtime, which courts have concluded does not discharge an employer's duty to account for all overtime work.  *See Chao*, 514 F.3d at 288-90; *Reich*, 28 F.3d at 1084.  Indeed, allowing Alliance to hide behind its Handbook would threaten to eviscerate the FLSA, as it would enable employers unofficially to pressure employees not to record overtime through management, but then defeat ensuing claims on the ground that its supervisors acted ultra vires.

However, after again combing through the parties' submissions, I am satisfied that there is

a genuine dispute of material fact as to whether Ms. Richardson knew that Mr. Clark was not accurately recording his hours.

Ms. Richardson and Mr. Clark both testified that Ms. Richardson told Mr. Clark that he could not record more than forty hours per week, regardless of how much he actually worked. ECF 29-1 at 15, Tr. 110, 113. Further, Ms. Richardson testified that she knew Mr. Clark continued to work overtime following the conversation. *See* ECF 28-2 at 13, Tr. 48-49 (Ms. Richardson testifying that Mr. Clark "just worked the hours he needed to work without knowing that he could get paid for them").

On the other hand, in Alliance's opposition to plaintiff's motion for partial summary judgment (ECF 34), the Company challenged whether the conversation between Ms. Richardson and Mr. Clark in fact occurred, positing that the consistency of Mr. Clark's timekeeping practices throughout his employment at Alliance could lead a jury to "reasonably conclude that Richardson gave no instruction to Clark to not record more than 40 hours of work in a week." *Id.* at 37; *see* ECF 29-1 at 19, Tr. 129 (admission of Mr. Clark during his deposition that his timekeeping practices remained unchanged following his conversation with Ms. Richardson).[4]

The dispute turns on credibility. Accordingly, it must be decided by the fact finder, not the court on summary judgment. *See Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006).

In sum, there is no dispute that Alliance charged Ms. Richardson with supervising Mr. Clark, including his work hours. Therefore, under settled agency principles, Ms. Richardson's knowledge of Mr. Clark's unpaid overtime is attributable to Alliance *if*, in fact, she had such

---

[4] Although the Company's contention is found only in the last sentence of the lengthy brief's penultimate page, it suffices to raise the issue of whether Ms. Richardson spoke with Mr. Clark's concerning his overtime.

knowledge.   Thus, plaintiffs must prove at trial that Ms. Richardson knew that Mr. Clark was working unpaid overtime.   It is for the jury to decide whether Ms. Richardson had knowledge of Mr. Clark's overtime work.

### IV.   Conclusion

For the foregoing reasons, I shall grant the Motion to Reconsider (ECF 42) in part and deny it in part.   An Order follows, consistent with this Memorandum Opinion.


Date: April 29, 2020                                          _____/s/_____
                                                             Ellen L. Hollander
                                                             United States District Judge

21